16-2723-pr
*Hyman v. Brown*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2017

No. 16-2723-pr

TULLIE HYMAN,
*Petitioner-Appellee,*

v.

WILLIAM D. BROWN, Superintendent,
*Respondent-Appellant,*

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED: NOVEMBER 29, 2017
DECIDED: JUNE 24, 2019

Before: JACOBS, RAGGI, and DRONEY, *Circuit Judges.*

On appeal from a judgment of the United States District Court for the Eastern District of New York (Dearie, *J.*) granting habeas corpus relief from a state murder conviction, *see* 28 U.S.C. § 2254, respondent challenges the district court's determinations that (1) petitioner made the gateway showing of actual innocence necessary

for merits review of his procedurally barred claim of ineffective assistance of counsel, and (2) the state court's rejection of that Sixth Amendment claim was an unreasonable application of clearly established Supreme Court precedent. For reasons stated herein, we reject the gateway determination and, therefore, dismiss without addressing the barred Sixth Amendment claim.

Judgment REVERSED and Petition DISMISSED.

Judge Jacobs concurs in a separate opinion.

---

RANJANA C. PIPLANI, Assistant District Attorney (John M. Castellano, Assistant District Attorney, *on the brief*), Kew Gardens, New York, *for* Richard A. Brown, District Attorney, Queens County, *for Respondent-Appellant.*

GLENN A. GARBER (Rebecca E. Freedman, *on the brief*), The Exoneration Initiative, New York, New York, *for Petitioner-Appellee.*

---

REENA RAGGI, *Circuit Judge*:

Respondent William Brown appeals from a judgment entered on July 13, 2016, in the United States District Court for the Eastern District of New York (Raymond J. Dearie, *Judge*), which, pursuant to 28 U.S.C. § 2254, grants petitioner Tullie Hyman relief from a New York State judgment convicting him of, among other crimes, the second-degree depraved indifference murder of Maria Medina, the innocent victim of a gunfight bullet gone astray. *See Hyman v. Brown*, 197 F. Supp. 3d 413 (E.D.N.Y. 2016). The district court concluded that

Hyman's conviction had been obtained in violation of the Sixth Amendment right to effective assistance of counsel because, as the result of a conflict of interest grounded in a fee dispute with a private investigator, counsel failed to call the investigator as a witness at Hyman's trial, where he could have offered evidence to impeach the prosecution's lead identification witness. *See id.* at 464–66.

When Hyman earlier presented this constitutional claim in a collateral state challenge to conviction, a New York court rejected it on a state procedural ground, as well as on the merits. *See People v. Hyman*, No. 1787/00 (Sup. Ct. Queens Cty. Aug. 4, 2009) (reproduced in App'x 3285–95). The independent procedural ruling erected a bar to federal habeas review that Hyman concedes he cannot overcome by showing good cause to excuse his procedural failure and ensuing prejudice. *See House v. Bell*, 547 U.S. 518, 536 (2006) (collecting cases discussing "cause and prejudice" exception to procedural bar). Nevertheless, the law affords another narrow "gateway" to merits review of defaulted claims for habeas petitioners who can make credible and compelling showings of actual innocence. *Id.* at 538. The district court found that Hyman satisfied this demanding standard and, thus, reached the merits of his Sixth Amendment claim. *See Hyman v. Brown*, 197 F. Supp. 3d at 463. Respondent here challenges both this gateway finding and the district court's identification of Sixth Amendment error.

On *de novo* review of petitioner's actual innocence claim, *see Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (stating that actual innocence determination presents "mixed question of law and fact" reviewed *de novo*), we conclude that Hyman has not carried his gateway burden. Accordingly, we vacate the challenged judgment and order Hyman's habeas petition dismissed.

BACKGROUND

In reviewing a gateway claim of actual innocence, a court "must consider all [record] evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. at 538 (internal quotation marks omitted). Our background discussion is, therefore, necessarily lengthy.

## I. Overview

On the evening of March 10, 2000, Maria Medina was performing volunteer "tenant patrol" duty in the lobby of 1540 Hassock Street, the Queens apartment building where she resided within the Redfern public housing project.[1] At approximately 7:00 p.m., a shootout erupted in the street in front of that building ("March 10 shootout"). Within minutes, more than thirty bullets were fired from at least four different weapons. One of these bullets entered the lobby and killed Ms. Medina.

New York State charged four persons with crimes relating to the March 10 shootout: Jonathan Whitmore and Derek Harris, who were thought to have been shooting from the fence and walkway adjoining 1540 Hassock Street toward the street; and Osimba Rabsatt and petitioner Tullie Hyman, who were thought to have been shooting from the street toward the building. Only Rabsatt and Hyman stood trial. Whitmore and Harris each pleaded guilty to

---

[1] Tenant patrol is a program whereby residents of public housing volunteer to provide services, such as signing in visitors, to enhance the security of their homes. *See* Trial Tr. at 779–80; *see also Engagement*, N.Y.C. PUB. HOUS. AUTH., https://www1.nyc.gov/site/nycha/residents/getting-involved-as-a-resident.page (last visited June 21, 2019).

criminal possession of a weapon and were sentenced to respective prison terms of seven years and two years.

At the Rabsatt-Hyman trial, the prosecution's theory was that, on the night of March 10, these two men drove to 1540 Hassock Street in a red Acura (Rabsatt) and a green Mazda (Hyman), double-parked the cars across from 1540 Hassock Street—with their passenger sides toward the middle of the street and facing 1540—and proceeded to engage in a gunfight with Whitmore and Harris. Rabsatt successfully challenged this theory by offering alibi evidence placing him elsewhere at the time of the gunfight. The jury acquitted him on all counts. Not so Hyman, who did not dispute being at the shootout in a green Mazda, but who maintained that he was an unarmed victim of, rather than a participant in, the gunfight. Finding otherwise, the jury returned a guilty verdict against Hyman for second-degree depraved indifference murder, *see* N.Y. Penal Law § 125.25(2); criminal possession of a weapon in both the second and third degrees, *see id.* §§ 265.03(1), (2); and first-degree reckless endangerment, *see id.* § 120.25.[2] Sentenced to a total prison term of 21 years to life for these crimes,[3] Hyman began serving his sentence in June 2002, and remained incarcerated until October 2016, when he was released pursuant to the July 2016 habeas judgment granting such relief unless the state took substantial steps to retry Hyman within 90 days. Failing to procure a stay of that order, the state released Hyman and timely appealed.

---

[2] The jury acquitted Hyman on one count: the second-degree attempted murder of Jonathan Whitmore. *See* N.Y. Penal Law §§ 110.00, 125.25.

[3] The state court sentenced Hyman to concurrent prison terms of 21 years to life for second-degree depraved indifference murder, 15 years for criminal possession of a weapon in the second degree, seven years for criminal possession of a weapon in the third degree, and two to six years for reckless endangerment.

## II. State Proceedings

### A. Trial

#### 1. Trial Evidence

To secure Hyman's conviction, the state offered evidence generally falling into three categories: (1) Hyman's own statements to the authorities, (2) eyewitness accounts of the shootout, and (3) forensic evidence of the crime scene. Hyman offered no evidence in defense.

##### a. Hyman's Statements

###### i. March 11, 2000

On March 11, 2000, upon learning that police were looking for him in connection with the prior night's shootout, Hyman voluntarily surrendered himself at the 113th precinct in Queens, New York. Waiving his *Miranda* rights, Hyman admitted being present during the shootout, but denied firing a weapon. To the contrary, he reported being unarmed when he went to 1540 Hassock Street to pick up his girlfriend, Shakina Harris[4] and, there, was ambushed by men shooting at him. Hyman then gave police a sworn statement, which a detective read to the jury as follows:

> On Friday [*i.e.*, March 10, 2000] when I [*i.e.*, Hyman] came home from court Shakina called me and we were going to meet later 8:00 or 9:00. I would pick her up at her building, the last one. I drove down the street, the one way and pulled up behind a white civic. I put [on] my hazard indicators, took the car out of gear, put it in neutral and pulled the emergency brake up.

---

[4] Shakina Harris is the sister of Derek Harris, one of the charged shooters in the case.

6

I looked over by the stores and the building. No one was there. Dark station wagon was backing across from me. Then I heard three or four shots. I looked in my door mirror and saw two guys coming up behind me from the sidewalk firing. I got low in the car. I tried to put the car in gear but it stalled out. I got it back on. I saw two guys get out of the wagon and they were firing in my angle. I got the car in reverse and went around the civic. I made a left at the light and went to my brother's house and told him what happened. Grabbed some clothes. Called my girlfriend and left.

Trial Tr. at 1388–89.

### ii.   March 12, 2000

The following day, Hyman again waived his *Miranda* rights and told police that he had driven to 1540 Hassock Street on March 10 in a red Acura. After Hyman stopped the car, two men emerged from the car parked behind his and began shooting at him. Other persons also fired at Hyman from the side of his car before he fled the scene.

Approximately two hours later, and after Hyman spoke with his mother, he revised his account, telling police that he had not driven to Hassock Street in a red Acura, although he had driven such a car in the recent past. Rather, he had driven to Hassock Street in a green Mazda that he "just recently bought." *Id.* at 870.[5]

---

[5] Police recovered the green Mazda from Hyman's aunt's garage. They elsewhere located a red Acura linked to Hyman by papers found therein, specifically, a benefits card and a court summons in his name.

On June 8, 2000, Hyman testified before a grand jury, maintaining that he went to 1540 Hassock Street on March 10 to pick up his girlfriend; that he was unarmed; that after he parked, he "heard multiple shots coming from the back of [his] car," *id.* at 1725; that four people fired at him, "two from the left side and two from the right side," *id.* at 1731; and that, in the course of the shooting, the glass from the "passenger side window" of his car "popped in [his] face," *id.* at 1734. Hyman also testified that he had driven to Hassock Street by himself in a green Mazda MX6, not in a red Acura. He acknowledged that, before acquiring the green Mazda, he had driven a red Acura, but he said that car was not at the shootout scene. Hyman also denied knowing Jonathan Whitmore, threatening him, or recognizing him at the shootout scene.

### b.    Eyewitness Testimony

While Hyman's own statements thus established his presence at the March 10 shootout as the sole occupant of a green Mazda, the state relied on four eyewitnesses—Margaret Contreras, Lynn Burton, Deborah McCoy, and Shaquana Ellis—to establish that Hyman was not an unarmed ambush victim but a shooting participant in the gunfire exchange. Each woman testified to seeing gunshots fired from, or by the occupant of, the green Mazda, but only Ellis would specifically identify Hyman as that shooter. Her recantation of that identification is the basis for Hyman's actual innocence claim.

### i.    Margaret Contreras

Margaret Contreras testified that she was on tenant patrol with Maria Medina and Shereda Freeman on March 10, 2000, when she

heard several gunshots, one of which struck Medina.[6]  As she and Freeman pulled the injured Medina toward the elevator, Contreras saw, through the lobby door, a "dark greenish" car parked in the street.  *Id.* at 1038.  The car's window was down, and Contreras there saw "something silverish" that "looked like a gun but it was like a flash."  *Id.*  Contreras acknowledged that she did not mention the car or any gunfire flash in her initial police interview, explaining that "[n]o one ever asked" about "what happened outside of the building."  *Id.* at 1096.  She explained that she disclosed these facts when prosecutors showed her a photograph of a car—Hyman's green Mazda—and asked if she had ever seen it.  She told them it looked like the car outside her building on March 10 and then recounted what she had seen.  Contreras testified that things were happening "really fast" on the night of the shootout, *id.* at 1040, and that her focus was on getting Medina to safety rather than on trying to "see something" outside, *id.* at 1049.  Nevertheless, she did not waver in her testimony to seeing a flash of gunfire coming from the window of the dark green car parked outside her building on March 10.

Although Contreras had never told prosecutors that she could identify anyone involved in the shootout, on cross-examination she stated for the first time that, on the evening of March 10, she had seen Whitmore, her neighbor, enter 1540 Hassock Street carrying a gun.  Later that night, Whitmore knocked on Contreras's door and told her that he was "very sorry about all this stuff that happened."  *Id.* at 1084.  Contreras stated that she had not previously told anyone about seeing Whitmore because she was worried for her 16-year-old son.

---

[6] Shereda Freeman would also testify at trial, but only to her efforts to assist Maria Medina. She offered no evidence about the shootout.

9

Contreras was, in fact, moved out of her building soon after the March 10 shootout.

## ii.      Lynn Burton

Lynn Burton testified that she was in the bedroom of her third-floor apartment at 1540 Hassock Street when she heard gunfire erupt on the evening of March 10.  From a window of her apartment facing the street, Burton saw three cars double-parked in front of the Friendly market across the street: "a green jeep, a red color car with dark tinted windows," and "behind that . . . a dark colored car."  *Id.* at 1594.  Burton initially told police the last car was a black or dark Altima, but, subsequently, and at trial, she identified the "dark colored car" as Hyman's green Mazda.[7]  Burton testified that she saw "shots being fired" from "the red vehicle and the dark colored vehicle that was behind the red vehicle," but that she did not see who fired them.  *Id.* at 1594–95.  What she saw "was some fire coming out of a window."  *Id.* at 1628.  Burton did not see anyone standing near or leaning out of the cars.  Nor did she see Whitmore, whom she knew well because his mother lived at 1540 Hassock Street.

## iii.      Deborah McCoy

Deborah McCoy resided in a building across from 1540 Hassock Street.  She testified that after hearing gunshots on the evening of March 10, she ran to the kitchen window of her seventh-floor apartment, from where she saw a red Acura parked in front of what she initially described as a "black" car, but which she subsequently stated looked like Hyman's dark green Mazda as

---

[7] Specifically, Burton was shown two photographs in evidence of the green Mazda that Hyman admitted to driving to 1540 Hassock Street on March 10 and that police recovered from his aunt's garage.  Burton testified that it looked like the car from which she had seen shots fired on March 10.

10

depicted in police photographs. *Id.* at 1783. McCoy testified that shots "first came from the cars." *Id.* at 1813. She identified one shooter, standing near the driver's side of the red car, as Osimba Rabsatt, whom McCoy knew from high school. She saw another man—whom she could not identify—get out of the dark car, fire a gun, and then get back into the car. McCoy testified that she also saw Whitmore and Harris shooting toward the cars as they ran along a walkway toward the entry of 1540 Hassock Street. McCoy knew Whitmore because she is his sister's godmother and Whitmore's mother is godmother to McCoy's son. McCoy telephoned 911 to report the shootout, but did not then mention any participants by name.[8]

### iv.    <u>Shaquana Ellis</u>

Shaquana Ellis testified that, at the time of the March 10 shootout, she was standing in the third-floor hallway of 1540 Hassock Street with two friends, Amanda Benitez and Shaquana Delain. Through a hallway window, Ellis saw two cars pull up to the building: a red Acura with tinted windows and a green Mazda. After the cars "sat there" for a while, Ellis saw "Tullie," *i.e.*, Hyman, "hanging out the . . . window, from the passenger side" of the green car, "just fir[ing] off" gunshots. *Id.* at 1550–51. Ellis testified that she never actually saw a gun; rather, she saw about five flashes of light, which looked like "fire, like red come out of the gun," coming from Hyman's direction. *Id.* at 1553. Ellis stated that she did not see Whitmore, Harris, or anyone else at the shootout scene.

---

[8] The jury heard that nine 911 calls reported the shootout. Five calls did so generally. One caller reported a man with a gun in front of the building. Two callers (one of whom placed two calls) identified Whitmore as a shootout participant.

11

Ellis admitted not reporting these events to the police when first interviewed. At that time, she told authorities she had not seen the shooting at all. Ellis, nevertheless, denied telling friends or a private investigator that she had not seen the shootout. She also denied that Whitmore had paid her to incriminate Hyman, although she acknowledged that Whitmore had corresponded with her from prison.

### c. Forensic Evidence

Within twenty minutes of the March 10 shootout, police had secured the area in front of 1540 Hassock Street and started to collect evidence. Much of the ballistic evidence gathered indicated that bullets were fired not only at, but also from, Hyman's green Mazda.

The recovery of four discharged .45 caliber shell casings and fourteen discharged 9mm shell casings from the middle of Hassock Street indicated gunshots fired in that vicinity, which was consistent with the location of cars double-parked there on March 10, including Hyman's green Mazda. Meanwhile, twelve discharged .380 caliber shell casings were recovered from the fence and walkway bordering the front of 1540 Hassock Street. This corresponded to Deborah McCoy's account of Whitmore and Harris firing gunshots at the parked cars as the two men ran toward the building.

Police matched most of these shell casings to firearms recovered at the scene. Specifically, six of the twelve .380 caliber shell casings—*i.e.*, casings for bullets fired from 1540 Hassock Street—were matched to a .380 caliber handgun found on the rear lawn of the building. Whitmore would later admit firing that gun during the March 10 shootout. The other six .380 caliber casings went unmatched. Meanwhile, all recovered .45 caliber and 9mm casings—

*i.e.*, casings for bullets fired from the vicinity of the double-parked cars—were matched to a .45 caliber handgun and an Intratech 9mm semiautomatic pistol found inside the spare tire wheel well of Whitmore's Ford Taurus.[9]  At trial, the prosecution took the position that the bullet that killed Ms. Medina came from one of these two guns, which had been fired toward 1540 Hassock Street by Hyman and Rabsatt.[10]  To explain how guns fired by Hyman and Rabsatt wound up in Whitmore's car, the prosecution suggested that someone might have planted them there to divert attention from Hyman and Rabsatt.  Finally, no ballistic evidence was matched to another 9mm handgun, found broken into eight parts in a trash compactor inside 1540 Hassock Street.

Police further discovered that bullets had penetrated the door and rear lobby of 1540 Hassock Street.  The height of some bullet holes—1'10" and 1'5.75" above ground level—was consistent with shots being fired toward the building from the window level of a car in the street.  Bullet marks were also found in a second-floor apartment of 1540 Hassock Street, the Friendly market across the street, and three parked cars.

Meanwhile, when police subsequently recovered Hyman's green Mazda, they saw bullet damage concentrated on the vehicle's front hood, front passenger door, and right rear bumper, which was consistent with bullets fired from the direction of 1540 Hassock Street.  There was no bullet damage to the car's rear area or to its left side,

---

[9] Police had secured that car in the vicinity of 1540 Hassock Street on March 10, but did not search it until a few weeks later.

[10] Apparently, the state did not test the bullet killing Ms. Medina to confirm this theory.

although Hyman had claimed that assailants had fired at him from the rear and from both sides of the vehicle.

Forensic examination also determined that the Mazda's front passenger window was open during the shootout—as some eyewitnesses had reported—because the shattered window was inside the door's window track and there was a bullet hole in the door below the track.

## B. Conviction and Direct Appeal

After the jury found Hyman guilty, and the case proceeded to sentencing, Hyman's counsel advised the court that a defense private investigator, Kevin Hinkson, had procured a statement from Amanda Benitez that impeached Shaquana Ellis's trial testimony about witnessing the March 10 shootout. Construing the disclosure as a request for adjournment of sentence in anticipation of a formal motion to vacate the verdict as required by N.Y. Crim. Proc. Law § 330.30, the trial court declined to grant such relief in light of two prior adjournments of sentence. Thus, on May 15, 2002, it sentenced Hyman to a total of 21-years-to-life imprisonment.

Hyman unsuccessfully appealed his conviction, first to the Appellate Division, which unanimously affirmed, *see People v. Hyman*, 15 A.D.3d 417, 788 N.Y.S.2d 863 (2d Dep't 2005), and then to the New York Court of Appeals, which denied review, *see People v. Hyman*, 4 N.Y.3d 854 (2005).

### C.  Collateral Challenges to Conviction

#### 1.  First § 440 Motion

On April 28, 2005, Hyman moved for collateral relief pursuant to N.Y. Crim. Proc. Law § 440, seeking DNA testing of the 9mm handgun recovered from Whitmore's car.  The state court denied the motion, concluding that Hyman failed to show that DNA testing would have resulted in a favorable verdict.  *See People v. Hyman*, 51 A.D.3d 689, 863 N.Y.S.2d 240 (2d Dep't 2008), *denying leave to appeal,* 10 N.Y.3d 960 (2008).

#### 2.  Second § 440 Motion

On July 7, 2008, Hyman filed a second § 440 motion based on (1) newly discovered evidence, specifically, Ellis's recantation of her trial testimony; and (2) ineffective assistance of counsel in failing to call investigator Hinkson as a trial witness to impeach Ellis.  Various affidavits were offered to support the motion.

##### a.  Kevin Hinkson

Investigator Hinkson stated that, in anticipation of Hyman's trial, he had inspected the third-floor hallway at 1540 Hassock Street and determined that it would have been "impossible" for Ellis "to observe the events of the shooting" from windows therein.  Second 440, Exh. Q.  Hinkson reported providing defense counsel with photographs and a video recording of the hallway supporting this opinion.[11]  Also prior to trial, Hinkson provided counsel with an unsigned statement from Amanda Benitez in which she admitted

---

[11] Only photocopies of Hinkson's photographs were attached to his § 440 affidavit, the original photos and videotape having been lost.  Although the copies are dark, they appear to show that the street area where the shootout occurred *could* be seen from the third-floor hallway window.

15

that, contrary to what she had told police and to what Ellis had testified at trial, Benitez and Ellis had not been at a third-floor window of 1540 Hassock Street at the time of the March 10 shootout.

Hinkson stated that trial counsel never discussed any of this evidence with him and never sought his testimony at Hyman's trial. Hinkson further stated that he has never been paid for his services on Hyman's case. While trial counsel told him that Hyman's family would pay Hinkson directly, Hyman's father told Hinkson that he had given counsel $2,500 to pay the investigator.[12]

b.    Amanda Benitez

On March 21, 2002—approximately a week after the jury found Hyman guilty—Benitez swore to the statement she had earlier given Hinkson, and Hyman offered that sworn statement in support of his second § 440 motion. Therein, Benitez admitted that she had not seen the March 10 shootout from the third-floor hallway window of 1540 Hassock Street. She stated that she arrived at the building only after police were already at the scene. Benitez then went to "Donald's" third-floor apartment, where Shaquana Ellis, Shaquana Delain, and others had already gathered. Second 440, Exh. J. They stayed in the apartment "all night because the police would not let us out." *Id*. When police came to speak with them the next morning,

> Shaquana Ellis pulled me [*i.e.*, Benitez] aside and told me to lie to the police and tell them I saw what happened. Shaquana told me a story to tell the police about my seeing Tully [Hyman] shooting a gun at Jonathan [Whitmore]. Shaquana Ellis was a friend of Jonathan

---

[12] In a sworn affidavit, Hyman's father, James Sanders, stated that he was "positive" he had given trial counsel $2,500 to pay for a private investigator, although trial counsel claimed never to have received that money. Second 440, Exh. P.

16

Whitmore and Jonathan's friends. I never did see Tully that night because I was not there when everything happened. . . . I told the police I was not there when it happened and that I did not know anything. The police kept telling me that I did see what happened and if I did not tell them, I would be arrested. . . . I told them the story Shaquana had told me to say and they wrote it down.

*Id.*

### c.  Stacey Manning

In another affidavit, Ellis's friend, Stacey Manning, recounted that, in the summer of 2002, Ellis told Manning that "she [*i.e.*, Ellis] didn't see who was shooting" during the March 10 gunfight, but she falsely testified in order "to help her cousin's baby's father, a guy named Jonathan Whitmore." Second 440, Exh. T. Manning said Ellis professed fear that authorities "w[ould] lock her up" if she now said that she had lied. *Id.*

### d.  Irwin Blye

Irwin Blye, a private investigator retained in connection with Hyman's § 440 motion, submitted an affidavit stating that, on September 7, 2005, he conducted an audiotaped interview with Shaquana Ellis who admitted that she had not seen the March 10 shootout. Ellis said she was inside an apartment when she heard— but did not see—the shooting occur. Ellis stated that she testified to seeing Hyman firing a gun because she had been threatened by "people from the neighborhood." Second 440, Exh. U. She said that someone called her home, told her what had happened, and what she should tell police. *See Hyman v. Brown*, 197 F. Supp. 3d at 439. Ellis told Blye that she had admitted not seeing the shootout to Amanda

17

Benitez.[13] She did not withdraw her statement to the police for fear of prosecution, but she felt "'real bad' because Mr. Hyman does not deserve to be in jail." Second 440, Exh. U.

### e. Robert DiDio

Hyman's § 440 counsel, Robert DiDio, filed an affirmation stating that Ellis had confirmed to him what she had told Blye, *i.e.*, that she had not witnessed the March 10 shootout. Ellis refused, however, to sign an affidavit to that effect and was evading a private detective trying to locate her.

### f. Ruling

The state court denied Hyman's second § 440 motion, rejecting his newly discovered evidence claim on the ground that Ellis had not provided a sworn recantation of her trial testimony as required by N.Y. Crim. Proc. Law § 440.30(1)(a). The court declined to pursue the matter at a hearing because Ellis then resided outside the court's jurisdiction and, thus, could not be compelled to appear. As for Hyman's ineffective assistance claim, the court concluded that Hyman had defaulted the point by not raising it on direct appeal despite a record basis to do so. *See id.* § 440.10(2)(c). In any event, the court rejected the claim on the merits, finding that Hinkson's affidavit did not convincingly establish that he had viewed the correct

---

[13] Ellis's claim that it was in a threatening phone call to her home that she was told what to tell police is at odds with Benitez's claim that Ellis told her falsely to report seeing the shooting on the morning of March 11 *before* these women had been able to leave 1540 Hassock Street. *See supra* at 16. Ellis's claim that she lied because she was threatened is also at odds with Manning's report that Ellis told her she did so because Whitmore was the father of her cousin's baby. *See supra* at 17.

locations in challenging Ellis's viewpoint, and that counsel's decision to forgo Hinkson's testimony may have been strategic in any event.

### 3. Coram Nobis Motion

Hyman thereafter moved for *coram nobis* relief, claiming the ineffective assistance of appellate counsel. The state court rejected the claim on the merits. *See People v. Hyman*, 73 A.D.3d 1211, 900 N.Y.S.2d 918 (2d Dep't 2010), *denying leave to appeal*, 15 N.Y.3d 806 (2010).

## III. Federal Habeas Proceeding

On August 26, 2010, Hyman filed the instant § 2254 petition *pro se*, raising eight grounds for vacating his state conviction. The district court appointed counsel, who pursued only two claims: the ineffectiveness of trial counsel and actual innocence. Counsel maintained that Hyman's conviction had been obtained in violation of the Sixth Amendment because his trial attorney had operated under a conflict of interest grounded in a fee dispute with investigator Hinkson, which resulted in the attorney not calling Hinkson as a trial witness to impeach Shaquana Ellis's identification. Recognizing that this Sixth Amendment claim was barred from federal review because the state court had rejected it, in the first instance, on a state procedural ground, and conceding that Hyman could not excuse the default through a showing of good cause and prejudice, counsel attempted to lift the bar by making a gateway showing of Hyman's actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 314–15 (1995).

To make this gateway showing, and to demonstrate a Sixth Amendment violation, Hyman relied both on evidence proffered in support of his second § 440 motion (already discussed *supra* at 15–18) and on evidence developed at a three-day hearing conducted by the district court in December 2015 and January 2016.

19

### A. Hyman's Habeas Hearing Evidence

#### 1. Shaquana Ellis

With the benefit of both court-appointed counsel and a promise from the Queens District Attorney not to prosecute her for perjury at Hyman's trial, Ellis testified in the district court that she did not witness the March 10 shootout and, thus, lied in testifying that she had at Hyman's trial. Ellis stated that, on March 10, she was outside 1540 Hassock Street when she saw Hyman pull up to that building in a green car, but she did not see him carrying or firing a gun. When she heard gunshots, Ellis ran into the building, going to Apartment 3A, where she saw Amanda Benitez and Shaquana Delain. Ellis said that her trial testimony, professing to have been with these women at the hallway window when the shooting occurred, was untrue. The only thing she saw from the hallway window on the night of March 10 was the lights of emergency vehicles responding to the shooting.

Ellis stated that she falsely testified to witnessing the shooting because "my life and my family life was threatened." Habeas Hearing Tr. at 36. Ellis explained that, as she was walking home alone at approximately 2:00 a.m. on March 11, an unknown individual, who "had a hoodie and a bandana around [his] face," exited a vehicle that had pulled up beside her and pointed a gun at her face. *Id.* The man told Ellis that if she "didn't go and point Tullie out in a lineup, that they were going to come kill [her] and [her] family." *Id.* The hooded individual, along with the car's driver, instructed Ellis to tell police that there were red and green cars at the shootout. Ellis said that she herself fabricated the detail about seeing flashes coming from Hyman's hands to make her account "convincing." *Id.* at 72.

The district court, whose opinion carefully details inconsistencies and implausibilities in Ellis's testimony, found her to be a "facile liar" and observed that "several features of [her] testimony were effectively undermined on cross-examination," notably, her account of the threat she claimed to have received the night of the shooting. *Hyman v. Brown*, 197 F. Supp. 3d at 445, 461. Nevertheless, the court concluded that the "critical admission" that she had not seen the shootout or Hyman firing a weapon, "rings very true," a conclusion reinforced by "other" corroborating evidence and by the state's failure to "impugn[] Ellis's *motive* for recanting." *Id.* at 461 (emphasis in original).

### 2. Amanda Benitez

Amanda Benitez testified that neither she nor Ellis arrived at 1540 Hassock Street until after the shooting was over and police already had secured the crime scene. Benitez did not speak with Ellis until the morning after the shooting, when Ellis said that her boyfriend, Shah, wanted Ellis and Benitez to tell police "that Tullie [Hyman] was the shooter," Habeas Hearing Tr. at 132, that the cars involved were green and red, and that Hyman "was hanging out the car shooting," *id.* at 136. Ellis said she was going to tell this story because she did not want Shah to go to jail, which led Benitez to think that Shah might have been involved in the shootout.[14] Benitez told Ellis she did not want to give this story, and when police interviewed Benitez, she stated that she did not know anything about the shooting because she did not see it. Only after police insisted that she must know something, did Benitez tell the story Ellis had given her, making clear that she had no personal knowledge of events, but was reporting

---

[14] This is the third motive identified for Ellis's false testimony in the state trial, Ellis herself ascribing it to death threats and Manning reporting Ellis's wish to help Whitmore, the father of her cousin's baby.

only what she had heard.  Benitez claimed that a disclaimer to this effect was written at the top of her police statement when she signed it, even though no such statement appeared on the signed document offered into evidence at the hearing.

The district court observed that while, "[i]n many respects, Benitez exuded credibility," her testimony was "problematic" in its "selective disavowals" of certain prior statements and the "patent incredibility" of her claim to have signed a statement for the police containing a now-missing disclaimer.  *Hyman v. Brown*, 197 F. Supp. 3d at 462.  On balance, the district court concluded that Benitez's "hearing testimony reliably support[ed] the narrow point for which it was offered, [*i.e.,*] as independent proof that Ellis was not present during the shooting and thus as corroboration of the basic premise of the recant."  *Id.*

### 3.  Shaquana Delain

Shaquana Delain, who had grown up with Ellis and Benitez, testified that, on the night of March 10, 2000, she was *not* with Ellis and Benitez in the third-floor hallway as Ellis had testified at trial.  Rather, Delain was inside an apartment at 1540 Hassock Street.  She heard no gunshots and learned about the shootout only when a building resident told her about it.  The district court found Delain's testimony wholly believable.  *See id.* at 452.

### 4.  Kevin Hinkson

Finally, the district court heard Kevin Hinkson testify to why he concluded it would have been impossible for anyone to have witnessed the shootout from the third-floor hallway.  The court observed that this testimony "essentially track[ed] the substance of [Hinkson's] 440 affidavits" and did not "add materially to the actual

22

innocence analysis." *Id.* The court did, however, rely on Hinkson's testimony in addressing the merits of Hyman's Sixth Amendment claim.

## B. Respondent's Evidence

In rebuttal, respondent offered evidence developed during the Medina murder investigation but not introduced at trial, specifically, statements inculpating Hyman by shooter Jonathan Whitmore and eyewitness Joseph Howard.[15]

### 1. Jonathan Whitmore

In a written statement to the police dated March 11, 2000, Whitmore admitted firing gunshots at Hyman the prior evening, but characterized his actions as defensive. Whitmore stated that he had been afraid of Hyman for some weeks after a friend told him about a note left on another friend's car stating, "I hope you['re] bulletproof," signed, "red Ac." Habeas Exh. G-14a. Although Whitmore never saw the note, he interpreted it as a threat to himself, understanding "red Ac" to refer to Hyman's red Acura and believing that Hyman was upset by Whitmore "trying to talk to his girl." *Id.*

In a videotaped interview the same day, Whitmore stated that he had never met Hyman, but knew that he had owned a red Acura and recently acquired a green Mazda MX6. In the weeks before the shootout, Whitmore's friends told him that Hyman was driving around 1540 Hassock Street looking for Whitmore. Although he initially tried to hide whenever he saw the red Acura, Whitmore eventually decided to protect himself and, toward that end, placed a

---

[15] Whitmore's statements were held inadmissible at the Hyman-Rabsatt trial pursuant to *Bruton v. United States*, 391 U.S. 123 (1968).

.380 caliber gun inside a box, inside a bag, just over the fence in front of 1540 Hassock Street.

Whitmore stated that, on the evening of March 10, 2000, he was outside 1540 Hassock Street, talking with Shaquana Delain and "Kim," when he saw a red Acura and green Mazda MX6 arrive at the building, "the green car in front and the red car [] behind it." Habeas Exh. K at 9. As Whitmore told the women to run inside, Hyman and another person began firing at Whitmore through the open front passenger window of the green car. Whitmore did not see what guns the men were using and, therefore, "[c]ouldn't say this was a 9mm or that was a .45." *Id*. at 23. What he did see was Hyman's face and arm extending out of the window, then lights and sparks. Whitmore retrieved his own gun and "just blast[ed] back," emptying a seven-shot clip. *Id.* at 10. Running inside the building as he fired, Whitmore went to his mother's apartment and threw the gun out a window.

The district court found Whitmore's accounts "generalized, unsubstantiated[,] . . . [and] patently incredible." *Hyman v. Brown*, 197 F. Supp. 3d at 456. It observed that Whitmore "fail[ed] to offer any plausible basis" for interpreting the note as "a threat to him," much less one requiring him to arm himself for a gunfight. *Id.* at 458. Further, his "self-serving" statements were in "stark conflict" with other evidence as well as the prosecution's trial theory. *Id.* For example, Whitmore placed himself in the company of two women when the shooting began, making no mention of Derek Harris, whom the prosecution had portrayed as his confederate in the shootout.[16] Also, Whitmore's placement of the green Mazda ahead of the red

---

[16] As recounted *supra* at 22, the district court found Shaquana Delain credible in testifying that she was inside an apartment at 1540 Hassock Street when the March 10 shootout occurred.

Acura conflicted with trial testimony from Ellis, Burton, and McCoy, which placed the cars in reverse order. And his professed sighting of two persons in the Mazda was at odds with Ellis's trial testimony, which placed Hyman alone in the vehicle. Finally, the district court thought it more than mere coincidence that Whitmore, in disavowing knowledge of the type of guns fired from the cars, mentioned the caliber of two guns actually used and later found in his car. Thus, the district court concluded that "the prosecution's resort to Whitmore's statement at the gateway hearing as a sort of smoking gun" rebutting Hyman's actual innocence claim "is difficult to explain; if introduced to rational jurors, their reaction would have to be an even further loss of confidence in the overall investigation." *Id.*[17]

### 2. Joseph Howard

On March 11, 2000, Joseph Howard told police that he was walking out of 1540 Hassock Street shortly after 7:00 p.m. the previous night when he saw a red, four-door Acura with tinted windows stop outside the building approximately 20 feet from him. Howard saw three African-American men in the vehicle, one of whom exited the passenger side and began shooting what appeared to be a .45 caliber or 9mm handgun.

---

[17] The conclusion is not ineluctable. The car-order discrepancy seems of little import to Whitmore's credibility as there is no question that he viewed the shootout and Hyman himself admits that he was at the scene in his green Mazda. Further, because Ellis now admits that she did not see the shootout, her testimony cannot impeach Whitmore or anyone else. Nevertheless, Hyman himself stated that he was alone in the green Mazda at the shootout, not with another person as Whitmore recalled. But Hyman's admission corroborates Whitmore, at least to the extent he placed Hyman in the green Mazda at the shootout. And if Burton's and McCoy's testimony as to the cars' order casts doubt on Whitmore's recollection as to that fact, these witnesses support Whitmore's identification of Hyman as a shooter: Burton, because she saw gun flashes coming from the green car, and McCoy because she saw gunshots fired by a person who briefly exited the green car. *See supra* at 10–11.

In a second interview four days later, Howard stated that he was actually at a nearby bus stop, approximately 50 feet from the red Acura, when he saw two men exit the car. Howard heard twenty to thirty gunshots exchanged. He then saw the two gunmen return to the Acura, which sped away.

From a photo array—no longer available for review at the habeas hearing—Howard identified Hyman as one of the March 10 shooters. In neither interview did Howard mention seeing a green car. Rather, he reported seeing a black jeep with tinted windows following directly behind the Acura, as if the two cars were together. But he did not state that he saw any gunshots fired from or by persons in that car.

The district court concluded that "no rational factfinder would assign significant weight to" Howard's statements because, despite his photo-array identification of Hyman as one of the shooters, "his story conflicts too materially with Ellis's for a jury to accept a prosecutor's decision to offer both his and her accounts." *Id.* at 459.[18] The court further observed that "the dark car Howard says he saw behind the red Acura was a Jeep, which cannot plausibly be confused with a green Mazda MX6, a sports car." *Id*.[19] In any event, the district court noted that respondent could not offer "a definite reason" for not calling Howard as a trial witness, reporting only that he was "'very, very difficult to find at the time of the investigation and not very cooperative.'" *Id.* at 458 (quoting Habeas Hearing Tr. at 5–6).

---

[18] Whatever concerns Howard's account might raise, inconsistency with Ellis's trial testimony would not appear to be one of them once the district court credited her testimony that she had not, in fact, seen the March 10 shootout.

[19] Hyman himself reported seeing a Jeep on Hassock Street at the time of shootout, and his statements leave no doubt as to the presence of his green Mazda.

## C. The District Court's Ruling

### 1. Actual Innocence

In a 91-page opinion reviewing the above evidence in detail, the district court ruled that Hyman had made the gateway showing of actual innocence necessary to lift the procedural bar to habeas review of his Sixth Amendment claim. Insofar as the gateway standard required Hyman to adduce credible new evidence of innocence, the district court ruled that he carried that burden simply through the Manning, Blye, and Sanders affidavits offered in support of his second § 440 motion. *See id.* at 461. Each of those affidavits cast doubt on Shaquana Ellis's trial testimony professing to have witnessed the March 10 shootout. In any event, Hyman carried his burden through further new evidence: the hearing testimony of Ellis, Benitez, and Delain, the first two of whom were credible, if not in whole, at least on the "narrow" proposition that Ellis was not present during the shooting and, thus, could not identify Hyman as a participant. *Id.* at 462.

The district court ruled that this new evidence made a compelling showing of innocence because "unless Ellis's [trial] testimony was believable, there was essentially no case against Hyman." *Id.* The district court further concluded that Ellis's recant "would likely breathe new life into the defense theory that she and other witnesses may have slanted their accounts to promote the theme that Whitmore was the victim." *Id.* at 463. Thus, the district court concluded that the new evidence made it "'more likely than not'" that "'any reasonable juror would have a reasonable doubt' about Hyman's guilt." *Id.* at 462 (quoting *House v. Bell*, 547 U.S. at 538).

### 2. Sixth Amendment Claim

As to Hyman's Sixth Amendment claim, the district court concluded that the state court unreasonably applied both prongs of *Strickland v. Washington*, 466 U.S. 668 (1984), in denying Hyman relief from judgment. At the objectively-reasonable-conduct prong of inquiry, the district court ruled that *Strickland* did not permit the state court to conclude that trial counsel's decision not to call Hinkson could have been reasonable strategy because "there is no articulable, reasonable, strategic reason" for counsel not to have introduced Hinkson's sightline findings. *Hyman v. Brown*, 197 F. Supp. 3d at 464. The district court thought that conclusion only reinforced by the fact that counsel was then operating under an "actual conflict of interest," *i.e.*, a fee dispute with the investigator. *Id.* at 466 (internal quotation marks omitted). At the prejudice prong of inquiry, the district court faulted the state court for "fail[ing] to appreciate the pivotal role Ellis's testimony played in the state's case," which meant that, "had counsel successfully impeached Ellis" with Hinkson's findings, "there is a more than reasonable probability that the result of the proceeding would have been different." *Id.*

### DISCUSSION

## I. The Actual Innocence Gateway

As the district court recognized, Hyman's actual innocence claim plays a "procedural, not substantive" role in this case. *Rivas v. Fischer*, 687 F.3d at 541. Even if successful, the claim cannot itself afford Hyman habeas relief from his state conviction. It can only open a gateway to federal review of an otherwise procedurally barred Sixth Amendment claim that, if itself successful, could afford him relief. *See Schlup v. Delo*, 513 U.S. at 314.

28

This is not to minimize the importance of an actual innocence claim. "[C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system," both state and federal. *Id.* at 325. But within that system, "trial is the paramount event for determining the guilt or innocence" of an accused. *Herrera v. Collins*, 506 U.S. 390, 416 (1993). An accused enters trial with "a presumption of innocence" and a right to "insist that his guilt be established beyond a reasonable doubt." *Id.* at 398. Once guilt is so established, however, a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence. *See Rivas v. Fischer*, 687 F.3d at 540 & n.34 (observing that Supreme Court "has never explicitly recognized the existence of a freestanding actual innocence claim"). Rather, a federal habeas court will review state convictions for constitutional error. *See* 28 U.S.C. § 2254.[20]

The law, nevertheless, affords an actual innocence gateway claim because "the existence of a concededly meritorious constitutional violation is not in itself sufficient . . . [to] allow a habeas court to reach the merits of a barred claim." *Schlup v. Delo*, 513 U.S. at 316. Usually, that bar will be lifted only if a petitioner demonstrates good cause to excuse his default and ensuing prejudice. *See House v. Bell*, 547 U.S. at 536 (collecting cases). Even in the absence of that showing, however, the law recognizes that, in a "narrow class of

---

[20] Actual innocence is "'not itself a constitutional claim'"—except perhaps when raised in the context of an Eighth Amendment challenge to a capital sentence. *Schlup v. Delo*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. at 404); *cf. Moore v. Dempsey*, 261 U.S. 86, 87–88 (1923) (observing that issue on habeas review "is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved"). In *Herrera*, the Supreme Court presumed, without deciding, that the Eighth Amendment prohibition of cruel and unusual punishment would preclude the execution of a defendant who made a "truly persuasive" demonstration of actual innocence. 506 U.S. at 417 (concluding that defendant failed, in any event, to make that showing).

cases," there remains the risk of "a fundamental miscarriage of justice" if the defaulted constitutional claim is not heard. *Schlup v. Delo*, 513 U.S. at 315 (internal quotation marks omitted). That narrow class of "truly extraordinary" cases consists of those presenting credible and compelling claims of actual innocence. *Id.* at 338; *see Herrera v. Collins*, 506 U.S. at 404 ("[F]undamental miscarriage of justice exception[] is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (limiting "miscarriage of justice" exception to "extraordinary case[s], where a constitutional violation has probably resulted in the conviction of one who is actually innocent"). Thus, a state prisoner who "seek[s] access to a federal habeas court in the face of a procedural obstacle," and who cannot overcome that obstacle by showing cause and prejudice, "must advance *both* a legitimate constitutional claim *and* a credible and compelling claim of actual innocence." *Rivas v. Fischer*, 687 F.3d at 540 (emphases in original).

The petitioner's burden in making a gateway showing of actual innocence is deliberately "demanding." *House v. Bell*, 547 U.S. at 538; *see Schlup v. Delo*, 513 U.S. at 324 (observing that actual innocence claims are rarely successful); *accord McQuiggin v. Perkins*, 569 U.S. 383, 386, 401 (2013) ("stress[ing] that the *Schlup* standard is demanding" and cases satisfying it "rare"). It requires, first, that petitioner adduce "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. at 324. In addition to being reliable, *i.e.,* credible, the evidence must be compelling. This second requirement demands "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was

30

free of nonharmless constitutional error." *Id.* at 316; *accord Rivas v. Fischer*, 687 F.3d at 541.[21]

The standard's demand for "evidence *of innocence*," *Schlup v. Delo*, 513 U.S. at 316 (emphasis added), references "factual innocence, not mere legal insufficiency," *Bousley v. United States*, 523 U.S. 614, 624 (1998); *accord Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002); *see also Doe v. Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (Sotomayor, *J.*) ("As *Schlup* makes clear, the issue before [the] court is not legal innocence but factual innocence."). The new evidence need not demonstrate factual innocence to an "absolute certainty." *House v. Bell*, 547 F.3d at 538; *accord Rivas v. Fischer*, 687 F.3d at 542. But it must be sufficiently credible and compelling to allow a federal court to conclude that "more likely than not, in light of the new evidence, no reasonable juror would find [petitioner] guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. at 538; *see Schlup v. Delo*, 513 U.S. at 327; *Rivas v. Fischer*, 687 F.3d at 541.

As this court has recognized, this standard is "somewhat cryptic" in marrying a seemingly absolute requirement (no reasonable juror) to a probabilistic one (more likely than not). *Rivas v. Fischer*, 687 F.3d at 541 (citing *Schlup v. Delo*, 513 U.S. at 339 (Rehnquist, *C.J.*, dissenting) (characterizing standard as "classic mixing of apples and oranges")). Nevertheless, this court has located

---

[21] While this gateway standard is demanding, it is less than what would be required to support a free-standing claim of actual innocence. *See Schlup v. Delo*, 513 U.S. at 316 (observing, by reference to *Herrera v. Collins*, 506 U.S. 391, that, assuming actual innocence claim could support Eighth Amendment challenge to capital sentence, "evidence of innocence would have had to be strong enough to make [defendant's] execution constitutionally intolerable *even if* his conviction was the product of a fair trial" (emphasis in original) (internal quotation marks omitted)).

some guidance for its application in contrasts that the Supreme Court has drawn between the *Schlup* standard and other familiar ones. *See id.*

Notably, *Schlup* emphasizes that "actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." 513 U.S. at 329. Further, a "more likely than not" showing as to what "no reasonable juror would have found" requires "a stronger showing than that needed to establish prejudice," but not so strong as that demanded by the "'clear and convincing' standard." *Id.* at 327; *see Rivas v. Fischer*, 687 F.3d at 541.[22]

Further, the Court has stressed that *Schlup*'s actual innocence standard does not equate to the sufficiency-of-the-evidence standard in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Jackson* asks whether the trial evidence, viewed in the light most favorable to the prosecution, "could" allow any reasonable trier of fact to find a charged crime proved beyond a reasonable doubt. *Id.* By contrast, *Schlup*'s actual innocence standard considers a different "mix of evidence" from a different "vantage point." *Rivas v. Fischer*, 687 F.3d at 542. Specifically, a reviewing court assessing the probability of actual innocence is not limited to the trial record. To the contrary, it "must consider all the evidence, old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. at 538 (internal quotation marks omitted), and, in doing so, "is not bound by the rules of admissibility

---

[22] *Compare Strickland v. Washington*, 466 U.S. at 694 (holding that, to demonstrate prejudice, defendant must show "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"), *with Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (holding that petitioner must show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner" guilty (internal quotation marks omitted)).

32

that would govern at trial," *Schlup v. Delo*, 513 U.S. at 327. This is because, at the gateway stage of inquiry, a habeas court's task is not to identify trial error or to delineate the legal parameters of a possible new trial. It is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error. Thus, incriminating evidence obtained in the course of an unlawful search, or custodial admissions made in the absence of *Miranda* warnings, may well be inadmissible at trial. Nevertheless, such evidence is properly considered in assessing factual innocence, with the manner of procurement informing reliability and relevance and, therefore, weight.

The district court concluded otherwise: "all the evidence" does not mean evidence "unquestionably . . . available" to the prosecution at the time of trial but "clearly inadmissible" or simply not offered. *Hyman v. Brown*, 197 F. Supp. 3d at 454. In support, it cited *Schlup*'s quotation of the factual innocence standard proposed in a law review article by Judge Friendly for all federal habeas review:

> The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence *tenably claimed to have been wrongly excluded* or to have become available only after the trial.

*Schlup v. Delo*, 513 U.S. at 328 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142, 160 (1970)) (emphasis added). The district court construed the highlighted phrase to limit a habeas court's consideration of evidence known, but not offered, at trial, to evidence that might have been wrongfully excluded. *See Hyman v. Brown*, 197 F. Supp. 3d at 455

33

(explaining why Whitmore's confession inculpating Hyman, and Howard's out-of-court identification of Hyman, should not be considered in assessing Hyman's actual innocence claim—although concluding that, even on consideration, the claim succeeded). We cannot agree.[23]

The plain language of the sentence indicates that Judge Friendly, and in turn the Supreme Court, were emphasizing the absence of evidentiary limits on actual innocence review by explaining that "all evidence, includ[es]" even evidence illegally admitted at or wrongfully excluded from trial. *See, e.g.*, *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 77 n.7 (1979) (construing "including" to mean part of larger group (citing Webster's New Collegiate Dictionary 581 (1973))). Indeed, it would make no sense to suggest that an actual innocence assessment could be informed by illegally admitted evidence but not by properly excluded evidence. They are opposite sides of the same coin and equally probative of actual innocence (or guilt). Much less does it make sense to determine actual innocence from illegally admitted evidence but not from admissible evidence that the prosecution chose not to offer, whether because it seemed duplicative of, or simply less persuasive than, evidence now called into question by petitioner's new evidence.

Nor do we draw—as the district court did—an inference that *Schlup* was limiting its own pronouncement freeing actual innocence inquiries from rules of admissibility by following it with the quoted language from Judge Friendly. *See Hyman v. Brown*, 197 F. Supp. 3d at 455. In *Kuhlmann v. Wilson*, a plurality of the Court, after quoting

---

[23] As indicated *infra* at 55, we accord the Whitmore/Howard evidence little weight, except to note that it does not support Hyman's actual innocence claim. We here clarify only that a court is not barred from considering such evidence because it was properly excluded from, or available but not offered at, petitioner's original trial.

34

the same language from Judge Friendly, followed it with the unqualified conclusion that, "[t]hus, the question whether the prisoner can make the requisite showing must be determined by reference to *all probative evidence of guilt or innocence.*"  477 U.S. 436, 455 n.17 (1986) (emphasis added).

Accordingly, we construe the Supreme Court's actual innocence precedents to mean what they say, *i.e.*, that reviewing courts should assess actual innocence claims in light of "all the evidence" regardless of admissibility but with proper consideration for the weight the evidence can bear in light of relevance and reliability.  *See House v. Bell*, 547 U.S. at 538; *Schlup v. Delo*, 513 U.S. at 328; *Kuhlmann v. Wilson*, 477 U.S. at 455 n.17.

Nevertheless, a challenge arises in making an actual innocence assessment from "all the evidence" because *Schlup* requires adherence to the principle, "firmly established in our legal system," "that the line between innocence and guilt is drawn with reference to a reasonable doubt."  *Schlup v. Delo*, 513 U.S. at 328.  Moreover, it is not the court's "independent judgment as to whether reasonable doubt exists" that is determinative.  *Id.* at 329.  Rather, the court's task is to "make a probabilistic determination about what reasonable properly instructed jurors would do." *House v. Bell*, 547 U.S. at 538 (internal quotation marks omitted); *accord Rivas v. Fischer*, 687 F.3d at 542 (observing that *Jackson*'s use of the word "could" focuses inquiry "'on the *power* of the trier of fact to reach its conclusion,'" whereas *Schlup*'s "use of the word 'would' . . . 'focuses the inquiry on the *likely* behavior of the trier of fact'" (quoting *Schlup v. Delo*, 513 U.S. at 330 (emphasis added in *Rivas*))).  Presumably, properly instructed jurors would be told not to consider inadmissible evidence.  Nevertheless, given the emphasis the Supreme Court has placed on assessing actual

innocence claims in light of "all the evidence . . . without regard to . . . admissibility," *House v. Bell*, 547 U.S. at 538, we do not interpret its reference to "properly instructed jurors" as a limitation on the evidence to be considered by the court. Rather, we understand the phrase to signal that the habeas court should assume the jury has been properly instructed as to the elements of the charged crime and the prosecution's burden of proof when, upon reviewing the totality of the evidence, the court decides whether it is "more likely than not, in light of the new evidence, [that] no reasonable juror would find [the defendant] guilty beyond a reasonable doubt." *Id.*; *see Schlup v. Delo*, 513 U.S. at 331 (referencing juror "conscientiously following the judge's instructions requiring proof beyond a reasonable doubt" in reaching conclusion that no reasonable juror, so instructed, would be likely to vote for guilt if new evidence there adduced were found reliable on remand).

Applying these principles here, we conclude that Hyman has not made a gateway showing of actual innocence.

## II.    Applying the Gateway Standard

### A.    Respondent's Unpersuasive Challenges

In applying the gateway standard here, we begin by explaining why two of respondent's challenges to the district court judgment do not persuade.

#### 1.    There Are No Categorical Limits on the Types of Evidence that Can Support a Claim of Actual Innocence

The district court found credible and compelling new evidence that effectively impeached Shaquana Ellis's trial identification of

Hyman as a participant in the March 10 shootout. At the habeas hearing, Ellis herself recanted her trial testimony, admitting under oath that she did not see the shootout. That admission was corroborated by the sworn testimony or affidavits of six persons.

Respondent argues that, even if credible, impeachment evidence cannot be compelling because it does not fall within any of the three categories of "new reliable evidence" identified in *Schlup*. 513 U.S. at 324 (stating that petitioner must present "new reliable evidence—whether it be [1] exculpatory scientific evidence, [2] trustworthy eyewitness accounts, or [3] critical physical evidence"). Respondent's argument is defeated by *House v. Bell*, which instructs that *Schlup*'s list is illustrative, not exhaustive. *See* 547 U.S. at 537 (quoting *Schlup* list, but observing that "habeas court's analysis is not limited to such evidence"); *accord Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012) (observing that *Schlup*'s list is not exhaustive of evidence that can be reliable); *Wolfe v. Johnson*, 565 F.3d 140, 164 n.32 (4th Cir. 2009) (same); *Souter v. Jones*, 395 F.3d 577, 593 n.8 (6th Cir. 2005) (same).

Thus, we conclude that while certain evidence may bear more weight than other evidence in demonstrating factual innocence, there are no categorical limits on the types of evidence that can be offered to do so.

### 2. The District Court Did Not Clearly Err in Finding Ellis's Recantation Credible

Alternatively, respondent faults the district court for finding Ellis's recantation credible. We review a district court's credibility assessment of witnesses who testify before it only for clear error. *See Doe v. Menefee*, 391 F.3d at 163–64. Nevertheless, when, as here, a witness is recanting prior sworn testimony supporting a conviction,

37

we expect district courts to look upon the recantation "with the utmost suspicion." *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007). The district court should consider not only the recantation, but the motives that may have prompted it, the timing of the submission, any possible motive for the original testimony, any inconsistencies in the witness's account or between that account and other evidence, the plausibility or implausibility of inferences or assumptions that crediting the recantation would require, as well as all other factors generally considered in assessing witness credibility. *See generally Doe v. Menefee*, 391 F.3d at 164–65.

Here, respondent argues that the credibility of Ellis's recantation is suspect because her hearing testimony was compelled by federal subpoena, following her earlier refusal to provide a sworn statement. These circumstances warrant consideration in assessing Ellis's credibility, but they do not preclude a finding that her recantation is credible. So too the fact that Ellis's hearing testimony was given under a grant of immunity from prosecution for perjury in her trial testimony. The grant did not absolve Ellis of the duty to testify truthfully at the habeas hearing. Thus, this circumstance was also properly considered in determining credibility, but it did not compel a finding that Ellis's recantation was not credible.

As the record shows, the district court well understood these circumstances and others pertinent to Ellis's credibility. It did not hesitate to identify implausibilities and inconsistencies in Ellis's testimony. At the same time, the district court observed that Ellis's recantation was not recent; she had maintained it for more than a decade in speaking with various persons. The district court also noted respondent's failure to point to any motive Ellis might have for falsely recanting her trial testimony. In weighing the totality of these

38

circumstances, the district court had a unique advantage unavailable to this court: it heard directly from Ellis and observed her demeanor as her recantation was offered on direct examination and tested on cross-examination. *See id.* at 164 (recognizing that "district courts are generally best placed to evaluate testimony in light of the witnesses' demeanor"); *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) (recognizing "factfinder's unique ability to assess the witness" in making credibility determination).

Further, the district court heard testimony or reviewed affidavits from various persons who reported either that they did not witness the shootout with Ellis, as she testified at trial, or had heard her subsequently admit to not seeing the shootout. The district court conducted a thorough hearing to develop this evidence, proceeded carefully to assess the extent to which it corroborated or undermined Ellis's own account, and ultimately concluded that Ellis's recantation and the corroboration supporting it were credible—but only in part.

Specifically, the district court credited Ellis's recantation on the narrow point that she did not see the March 10 shootout and, therefore, could not identify Hyman as a shooting participant. Otherwise, the district court found Ellis to be a "facile liar" in explaining both her motives for testifying falsely at trial and her actual whereabouts at the time of the shootout. *Hyman v. Brown*, 197 F. Supp. 3d at 461. Similarly, as to corroborating witness Benitez, the district court credited only her testimony that she and Ellis were not in the third-floor hallway of 1540 Hassock Street at the time of the March 10 shootout and, thus, not in a position to see what occurred. It found implausible Benitez's explanation for telling the police otherwise and problematic her inconsistent accounts of the night's events.

We are satisfied that the district court viewed Ellis's recantation with the appropriate high level of skepticism. But just as the law permits a factfinder who identifies falsity in part of a witness's testimony to discredit the whole, *see, e.g.*, *Siewe v. Gonzales*, 480 F.3d 160, 170 (2d Cir. 2007) (referencing maxim *falsus in uno, falsus in omnibus*), it also affords a factfinder discretion to credit parts of a witness's testimony despite discrediting others, *see, e.g.*, *United States v. Norman*, 776 F.3d 67, 78 (2d Cir. 2015) (stating that factfinder is "free to believe all, some, or none of a witness's testimony" (internal quotation marks omitted)). On this record of careful evidentiary review and discernment by the district court, we identify no clear error in its decision to credit that part of Hyman's new evidence indicating that Ellis did not see the March 10 shootout and, thus, could not identify him as a shooting participant. We defer to that finding in now assessing whether such credible new evidence made a compelling showing of actual innocence.

## B.     Hyman Fails To Show Actual Innocence

The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence. Precisely because the gateway standard for actual innocence is demanding and rarely met, in applying it to Hyman's claim, we begin by considering circumstances in which courts have found it satisfied. *See Rivas v. Fischer*, 687 F.3d at 543 (being "guided by Supreme Court's application of [*Schlup*] standard in *House* [*v. Bell*]" in assessing Rivas's claim of actual innocence).

### 1. Precedents Identifying Compelling Showings of Actual Innocence

#### a. Schlup v. Delo

In *Schlup*, petitioner was convicted of murder based largely on the testimony of two corrections officers who identified him as one of three white prisoners who attacked a black inmate and stabbed him to death. Schlup sought federal habeas relief, maintaining his innocence and arguing that trial counsel had been constitutionally ineffective in failing to interview and call exculpatory witnesses. *See Schlup v. Delo*, 513 U.S. at 306–07. In remanding the case for application of a more-likely-than-not, rather than clear-and-convincing, standard of actual innocence, *see id.* at 327, the Supreme Court highlighted the following new evidence: (1) sworn affidavits from inmate eyewitnesses to the murder stating that Schlup was not present for the crime and implicating other inmates by name;[24] (2) the sworn affidavit of a former prison lieutenant reporting a disciplinary interaction with Schlup at and about the time of the killing, which cast doubt on Schlup's ability thereafter to have participated in the murder and still arrived at the prison dining room 65 seconds before the distress call prompted by the stabbing, as confirmed by a prison videotape; and (3) the affidavit of an inmate-clerk stating that there was no delay between the stabbing and his placing the distress call, and identifying the three men who assaulted the victim as persons other than Schlup, *see id.* at 331.

The Court acknowledged that this new evidence might be deemed "unreliable" at an actual innocence hearing on remand. *Id.*

---

[24] While the district court had considered these affidavits suspect, *see Schlup v. Delo*, 513 U.S. at 309 n.19, the Supreme Court deemed it noteworthy that it was "black inmates attesting to the innocence of a white defendant in a racially motivated killing," *id.* at 316.

Nevertheless, it observed that if the evidence were found credible, it was sufficiently compelling to warrant relief. *See id.*

b.     House v. Bell

The *House* petitioner was convicted of murdering a woman in the course of what prosecutors contended was a sexual assault. Central to the state's largely circumstantial case were forensic findings that House's semen was present on the dead woman's clothing and her blood was present on House's clothing. In claiming actual innocence, House produced new test results undermining both conclusions. Based on this evidence, prosecutors themselves admitted that the semen at issue was from the victim's husband, not House. *See House v. Bell*, 547 U.S. at 540. As for minute quantities of the victim's blood on House's clothes, new evidence prompted even the state's Assistant Chief Medical Examiner to acknowledge that the blood likely got on House's pants, not during the murder, but while the pants were in police custody and came into contact with mishandled autopsy samples of the victim's blood. *See id.* at 547. Nevertheless, the Supreme Court observed that the new forensic evidence would not, by itself, have allowed petitioner to pass through the actual innocence gateway. *See id.* at 548. What tipped the balance was further new evidence pointing to the victim's husband as her murderer.

Most important, in the Court's view, was testimony from two sisters who stated that, at a gathering at their home after the murder at which the victim's husband was drinking heavily, they heard him "rambling" about his wife's death, "crying," and saying he had

42

"slapped" her, causing her to "hit her head and it killed her," but "he didn't mean to do it." *Id.* at 549–50.[25]

At the habeas hearing, the husband denied killing his wife or confessing to doing so, and the district court "did not question his credibility." *Id.* at 552. Nevertheless, the Supreme Court noted that the husband's hearing account of his whereabouts on the night of the crime and his denial to ever striking his wife were both impeached by other evidence, in the latter case by the state itself. *See id.*

The Court thus characterized House's actual innocence claim as a "close" one. *Id.* at 554; *see also id.* at 553–54 (cataloguing evidence that might "still support an inference of guilt"). Nevertheless, because "the central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put forward substantial evidence pointing to a different suspect," *i.e.*, the victim's husband, the Court concluded that House had carried his *Schlup* burden because "had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.* at 554.

### c. Rivas v. Fischer

Finally, in *Rivas v. Fischer*, a case in which this court ruled that a *Schlup* showing of actual innocence could excuse an untimely habeas petition, *see* 687 F.3d at 550, we found petitioner to have carried that burden through new, "largely unchallenged—expert

---

[25] The Supreme Court distinguished the sisters' testimony from an "eleventh-hour affidavit vouching for a defendant and incriminating a conveniently absent suspect." *House v. Bell*, 547 U.S. at 552. "The confession evidence here involves an alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie. For this reason it has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused." *Id.*

testimony, which cast considerable doubt on the 'central forensic proof' connecting him" to the murder of his former girlfriend, *id.* at 547. That proof was the medical examiner's opinion as to the time of death. In 1987, he estimated that the victim had died sometime between Saturday afternoon March 28, 1987, and early Sunday morning, March 29, 1987. Because Rivas had a "complete" and "unchallenged" alibi for that time span, *id.* at 524, 543, the state "had no case" against him unless it could prove that the victim died earlier in the weekend, *id.* at 525. More than five years after the killing, the state decided it could make that showing. Although no further evidence had developed, a new district attorney asked the medical examiner to review his case file again, whereupon the examiner revised his opinion to conclude that the victim's death "more likely" occurred sometime "Friday night," March 27, 1987, or "very early Saturday morning." *Id.* at 524.

To support his actual innocence claim, Rivas offered new contrary evidence from a distinguished forensic pathologist, who testified with a "reasonable degree of medical certainty" that the condition of the victim's body when examined by the medical examiner at 3:30 p.m. on Monday, March 30, 1987—in "full rigor" and without "discoloration around the abdominal wall"—meant that her "death could not have occurred longer than 48 hours prior to the time" of examination, *i.e.*, could not have happened earlier than 3:30 p.m. on Saturday, March 28. *Id.* at 531 (internal quotation marks omitted). The state mounted no "serious challenge" to the expert's "credibility or expertise." *Id.* at 544. Moreover, it conceded that when the medical examiner revised his time-of-death estimate, he was under investigation for professional misconduct and, in November 1993, resigned his office, in part, to avoid criminal prosecution. *See id.* at 521. On this record, this court concluded that "any reasonable juror

would almost certainly credit" "the essentially unchallenged testimony of a respected forensic pathologist" as "against the word of a disgraced medical examiner," and "would therefore, more likely than not, harbor a reasonable doubt about Rivas's guilt." *Id.* at 543, 546.[26] At the same time, the court characterized the case as "close," noting that it "would not expect a lesser showing of actual innocence to satisfy the *Schlup* standard." *Id.* at 546.

### 2. Hyman's Credible New Evidence Does Not Make the Compelling Showing of Actual Innocence Required by *Schlup*

With the benefit of these precedents, we apply the *Schlup* standard here and conclude that Hyman's new evidence, even if credible, is not sufficiently compelling as to his actual innocence to make it more likely than not that "no reasonable juror," aware of the new evidence, would return a guilty verdict on the charged crimes. *Schlup v. Delo*, 569 U.S. at 329 (internal quotation marks omitted). This is evident from (a) the substance of the evidence itself, (b) its comparison to precedent, and (c) the totality of the evidence.

#### a. Substance

Plainly, the substance of credible new evidence will bear on how compellingly it demonstrates actual innocence. The new evidence established that Ellis did not see the March 10 shootout and,

---

[26] The court noted further new circumstantial evidence—"new" because not disclosed by the prosecution to the defense at trial—that was, at least, consistent with the victim dying on Saturday night: (1) an identified neighbor of the victim swore in an affidavit that, while watching "Saturday Night Live" late on Saturday night March 28, she had heard a "woman's voice," "shriek or scream," "like someone was in trouble and not like anyone kidding around," *Rivas v. Fischer*, 687 F.3d at 529 (internal quotation marks omitted); and (2) an unidentified neighbor reported hearing a dog barking and a car speeding away from the vicinity of the victim's home around 11:00 p.m. on Saturday night.

thus, lied in identifying Hyman as a participant. That is quite different from new evidence that an eyewitness to a crime falsely identified a person *other* than the one she actually saw commit it. Such a false identification can bear on actual innocence because it is more likely than not that an accused did not commit a crime if someone else in fact did. But no such conclusion obtains in the circumstance here. Ellis's failure to see the shootout means she cannot inculpate petitioner (or anyone else), but neither can she exonerate him. She simply has no eyewitness evidence bearing on either petitioner's guilt or his innocence. Whatever question that might raise as to the sufficiency of the prosecution's case absent Ellis's testimony, it does not indicate Hyman's likely innocence, much less do so compellingly. *See Bousley v. United States*, 523 U.S. at 623 (distinguishing factual innocence from "legal insufficiency"); *accord Dunham v. Travis*, 313 F.3d at 730.

### b. Precedent Comparison

The failure of Hyman's new evidence to make a compelling showing of innocence is further demonstrated by a comparison to *Schlup*, *House*, and *Rivas.* In each of these cases, the new evidence directly supported petitioner's factual innocence by indicating either that he *did not* commit, or *could not* have committed, the crimes of conviction.

In *Schlup*, inmate-eyewitnesses to a prison stabbing swore that petitioner was not one of the three (identified) men whom they saw participate in that crime. If credible, this new evidence indicated that petitioner *did not* commit the crime. Further, in *Schlup*, a former police lieutenant swore that he was disciplining petitioner at about the time of the stabbing. Such new evidence indicated that petitioner *could not* have committed the crime within the time between the discipline

46

encounter and his arrival in the prison dining room as indicated on a timed prison video recording.

In *House*, credible new tests of forensic evidence used to identify petitioner at trial as the murderer discredited those identifications. Further, two witnesses credibly testified to hearing the victim's husband admit to killing his wife. Such evidence indicated that the petitioner *did not* kill the victim, because her husband had.

Finally, in *Rivas*, credible new forensic evidence showed that the victim died, not at the time reported by a discredited medical examiner, but at a later time for which petitioner had an unchallenged alibi. Thus, the new forensic evidence together with the alibi indicated that petitioner *could not* have committed the murder at issue.

Although the evidence in both *House* and *Rivas* was thus found credibly to show that petitioner likely did not commit, or could not have committed, the crimes of conviction, the courts characterized the gateway showing in each case as "close." *House v. Bell*, 547 U.S. at 554; *Rivas v. Fischer*, 687 F.3d at 546. Indeed, in *Rivas,* this court observed that it "would not expect a lesser showing of actual innocence" than that made there "to satisfy the *Schlup* standard." 687 F.3d at 546.

The new evidence here makes a far "lesser showing" of actual innocence than that in *Rivas, House,* or *Schlup.* Evidence that Ellis failed to see the March 10 shootout leaves the trial record with no eyewitness identification of Hyman as the person firing a gun from the green Mazda. But the absence of such evidence does not mean that Hyman did not, or could not, have participated in the shootout. It means only that Ellis does not know who, if anyone, did. This is

47

not to foreclose the possibility that, in some circumstances, a recanted identification based on an admitted lack of knowledge, might so "thoroughly undermine[] the evidence supporting the jury's verdict" as to support the probability determination required by *Schlup*. *Id.* at 543; *see also House v. Bell*, 547 U.S. at 553–54. We conclude only that this is not such a case. To explain, we proceed to review the totality of the evidence.

### c.    Totality of the Evidence

The district court concluded that without Ellis's identification, the prosecution effectively had no case against Hyman. *See Hyman v. Brown*, 197 F. Supp. 3d at 462–63. The totality of the evidence shows otherwise.

### i.    Hyman Places Himself at the Shootout in the Green Mazda

To explain, Ellis's trial testimony can be understood to consist of two parts: (1) she saw Hyman at the scene of the shootout parked outside 1540 Hassock Street in a green Mazda, and (2) she saw Hyman firing a gun from the car's passenger window. Ellis did not recant the first statement. At the habeas hearing, she maintained that on March 10, 2000, she saw Hyman pull up to 1540 Hassock Street in a green car. When she heard gunshots, she ran inside without seeing who was doing the shooting. *See supra* at 20. But even if Ellis had recanted the first part of her trial testimony, that would not help Hyman because he does not dispute his presence at the shootout. The jury heard his statements to the police and grand jury admitting that, at the time of the shootout, he was indeed double-parked outside 1540 Hassock Street, alone, in his green Mazda. Moreover, Hyman acknowledged that he was not coincidentally caught up in the

48

shootout; he professed to be its unarmed target.[27]  In light of these admissions, the singular focus of Hyman's actual innocence claim is the second part of Ellis's testimony.  Is it more likely than not that, upon learning that Ellis did not see Hyman firing a gun during the March 10 shootout—because she did not see the shootout at all—no reasonable juror would find him guilty beyond a reasonable doubt of the charged crimes?  *See Schlup v. Delo*, 569 U.S. at 329.  The totality of the record does not admit that conclusion.

### ii.     Eyewitnesses See Gunfire From Vicinity of Hyman's Car

Ellis's recantation shows that *she* had no probative evidence as to whether Hyman fired a gun during the shootout.  But not so other eyewitnesses.  Three residents of the area testified at trial to seeing flashes of gunfire coming from a green (or dark) car or its occupant during the shootout.  Each witness identified the car as resembling Hyman's green Mazda.

Margaret Contreras testified that, as she was trying to move the fatally wounded Maria Medina from the lobby of 1540 Hassock Street to the relative safety of an elevator, she saw flashes of gunfire coming from the passenger window of a dark green car.  *See supra* at 9.  Lynn Burton testified that, upon hearing gunfire, she looked out a window of her third-floor apartment at 1540 Hassock Street and saw "shots being fired" from both a red car and the dark car parked behind it, which she described as "fire coming out of a window."  Trial Tr. at

---

[27] Because Hyman did not testify at trial or at the habeas hearing, his ambush claim was not tested by cross-examination.  Nevertheless, he himself cast doubt on his credibility by initially lying to police about driving to Hassock Street in a red Acura rather than the green Mazda that he knew was pocked with bullet marks.  *See, e.g.*, *United States v. Glenn*, 312 F.3d 58, 69 (2d Cir. 2002) (observing that defendant's "false exculpatory statements to law enforcement officials may be circumstantial evidence of consciousness of guilt").

1628. Deborah McCoy, who lived across from 1540 Hassock Street, testified that, after hearing gunfire, she looked out the kitchen window of her apartment and saw a man she recognized as Osimba Rabsatt firing a gun from near a red car, while another man, whom she did not know, got out of a dark car parked behind the red one, fired a gun, and then got back in the car. *See supra* at 10–11.

The fact that none of these women could identify the occupant of the green car is of no import because Hyman himself provided that evidence. He stated that he was the sole occupant of the green Mazda that was involved in the shootout. What is significant about these three women's testimony, then, is that each of them—viewing the shootout separately and from different vantage points—reported seeing gunfire coming from that car or its occupant. None testified to seeing the car ambushed.

Insofar as the witnesses' recollections differed on certain points—*e.g.*, the exact color of the car, whether its occupant fired from inside or outside the car—these differences are not a product of Ellis's recantation. Rather, they were known to the trial jury, which nevertheless voted to convict. Even with new evidence that Ellis had not seen the shootout, a reasonable juror would more likely than not attribute any car-color confusion among other witnesses to the limited light available at 7:00 p.m. in March for distinguishing among dark colors. As for whether Hyman fired some shots from inside or outside his car—or from both—a reasonable juror would more likely than not conclude that it was not necessary to resolve differences on this point because, in any event, the eyewitnesses all testified to seeing flashes of gunfire coming *from* the direction of the green car, not only *at* the

car as Hyman told police in claiming to have been ambushed.[28]  In light of consistent eyewitness testimony on this point, and Hyman's own admissions to being the sole occupant of the green car, Ellis's recantation of her gunfire sighting (based on a failure to see the shootout at all) would not likely preclude any reasonable juror from finding Hyman's guilt proved beyond a reasonable doubt.

In concluding otherwise, the district court reasoned that Ellis's recantation might heighten juror skepticism about Contreras's, Burton's, and McCoy's testimony because these women, like Ellis, had relationships with Whitmore or members of his family, providing a motive for them to testify in his favor.  The district court thought such bias was evident in Contreras's belated trial disclosure that she saw Whitmore enter 1540 Hassock Street carrying a gun.  While that belated disclosure—known to the trial jury—could certainly inform an assessment of Contreras's credibility, in the end, it is not likely that Ellis's recantation would make every reasonable juror reject Contreras's testimony.

To begin, it hardly appears likely that Contreras delayed reporting Whitmore's March 10 gun possession to shield him from police suspicion.  After all, on the day after the shootout, March 11, 2000, Whitmore himself told police that he had been in possession of a gun, firing an entire seven-shot clip at Hyman during the gunfight.  Whitmore simply attempted to minimize his culpability by saying

---

[28] There is some non-trial evidentiary support for Hyman shooting from outside as well as inside a car.  The Howard statement summarized *supra* at 25–26, identifies Hyman as one of two shooters exiting the red Acura.  And a police report summarizing interviews with 1540 Hassock Street residents indicates that, although most did not see the shooting, third-floor resident Tiffany Weeks stated that she saw two black males exit a red Acura and a green Mazda, fire guns, and then speed away.  In sum, even without Ellis, five eyewitnesses (six with Whitmore) reported seeing gunfire coming from, not only at, the parked cars.  No person interviewed reported seeing an ambush of the cars.

that he acted defensively rather than offensively. The fact that Contreras had seen Whitmore with a gun at the conclusion of the March 10 shootout did nothing to support or undermine Whitmore's defensive version of events. In any event, when questioned at trial, Contreras admitted seeing Whitmore. This makes it more, not less, likely that she would not lie under oath, whether about seeing Whitmore, seeing gun flashes, or any other part of her testimony.

Burton's gunfire sighting also sheds no light on who was the aggressor in the gunfire exchange.

As for McCoy, she testified that she "first" saw gunfire coming from occupants of the parked cars. Trial Tr. at 1813. But the statement must be considered in context. The gunshots McCoy first saw followed the gunshots she heard, which is what prompted her to go to the window. In short, when McCoy went to the window, the shootout was already underway. Thus, her testimony also did not identify either side in the shootout as the aggressor. Moreover, it hardly appears more likely than not that McCoy's mutual godmother relationship with members of Whitmore's family prompted her to shade testimony in his favor. She is the one trial witness who, on direct examination, specifically identified Whitmore as one of the March 10 shooters. Meanwhile, she did not identify Hyman. At trial, all she could state was that she saw gunfire coming from a red car and a dark car. While she identified Rabsatt as the driver of the red car, McCoy could not identify the driver of the dark car. It is Hyman's own statements that, even after Ellis's recantation, identify him as the sole occupant of that car.

52

### iii. Ballistic Evidence Indicates a Gunfire Exchange, not an Ambush

Ballistic evidence makes it unlikely that any reasonable juror would reject eyewitness testimony about seeing flashes of gunfire coming from Hyman's car. Notably, .45 caliber and 9mm shell casings were retrieved from the middle of Hassock Street, which was right about where they would have been discharged from guns fired from the passenger side window of a car double-parked across from 1540 Hassock Street, where Hyman placed his own car. Meanwhile, .380 caliber shell casings recovered from the walkway bordering 1540 Hassock Street were consistent with guns fired from that area toward the car, as Whitmore himself admitted. In short, the casings retrievals indicated gunshots fired both from and at the green car, not an ambush of the green car's unarmed occupant.[29]

As noted *supra* at 13, the guns that discharged the .45 caliber and 9mm casings retrieved from the middle of Hassock Street were themselves recovered from the wheel well of Whitmore's car. If Hyman fired one of the guns that discharged some of these casings, it is curious that the gun would wind up in Whitmore's car. The record offers no satisfactory explanation. At trial, the prosecution suggested that someone planted the guns in Whitmore's car to deflect blame

---

[29] At the habeas hearing, respondent stated that the ballistic evidence was not "probative as to . . . the defendant's participation." Habeas Hearing Tr. at 45. We construe this to concede that the ballistic evidence could not specifically identify Hyman as the person responsible for particular ballistic evidence. We do not construe it as a concession that the ballistic evidence was irrelevant to the chain of circumstances establishing Hyman's guilt, much less to Hyman's ability to make a compelling showing of actual innocence. Indeed, in the sentence following the "participation" statement, respondent noted the recovery of "several rounds of shells . . . or ballistics from the car [Hyman] was purportedly driving at the time." *Id.* As noted in text, spent shells would indicate shots fired from the general location where they were retrieved, *i.e.,* the parked green Mazda, while bullet marks on that car would indicate shots fired toward it. In sum, the ballistic evidence provides strong circumstantial evidence of a gunfire exchange, not an ambush.

from Hyman and Rabsatt. The hypothesis is pure speculation. Nevertheless, it was argued to the jury at Hyman's trial, which either accepted it or, more likely, did not find it necessary to resolve to conclude that guilt was established beyond a reasonable doubt. The important point for purposes of actual innocence is that Ellis's recantation neither simplifies nor complicates the puzzle. Accordingly, we do not think it more likely than not that, with the addition of Ellis's recantation to the gun-location puzzle, no reasonable juror would find Hyman guilty beyond a reasonable doubt based on the totality of other evidence.

The conclusion finds further support in ballistic evidence recovered from the 1540 Hassock Street building. The height of bullet holes in the lobby door was consistent with gunshots fired toward the building from a relatively low position, such as the open window of a parked car, as Contreras and Burton witnessed. That the Mazda's window was open during the shootout was confirmed by shattered glass inside the passenger door window track. The window did not "pop" in Hyman's face, as he told police in trying to support his ambush story. *See United States v. Glenn*, 312 F.3d 58, 69 (2d Cir. 2002).

Indeed, for bullets entering 1540 Hassock Street—including the bullet killing Ms. Medina—to have come from persons firing at the green Mazda as Hyman asserted, rather than from it as eyewitnesses testified, one or more shooters would have had to have been firing toward the car's *driver's* side. Hyman told police he was shot at from both sides of his car. *See supra* at 8. But that account is convincingly belied by the complete lack of bullet marks on the Mazda's driver's side. Nor were there bullet marks on the car's rear to support Hyman's story that the men who ambushed him first fired from that direction.

In sum, the totality of ballistic evidence indicates a gunfire exchange on March 10, not a one-sided ambush.

As for other evidence, not admitted at trial—such as the Whitmore, Howard, and Tiffany Weeks statements—we do not here assume a reasonable juror's likely reliance on those statements in finding Hyman guilty. We note only that the statements do not support his claim of actual innocence.

Any trial perjury is a serious matter and nothing mitigates Ellis's willingness to lie under oath—a willingness she appeared to maintain, at least in part, even at the habeas hearing. Nevertheless, where, as here, a witness recants a trial identification, not because the witness knows the accused not to be the person firing a gun during a shootout, but because the witness did not see the shootout at all, that new evidence is far less compelling in demonstrating actual innocence than that in *Schlup*, *House*, and *Rivas*. In light of petitioner's own admission that he was the sole occupant of the green car that was the focal point of the shootout; three eyewitnesses' testimony to seeing flashes of gunfire coming from that car or its occupant; and ballistic evidence indicating that bullets were fired from, not just at, the car, we cannot conclude that, upon learning of the Ellis recantation, it is more likely than not that "no reasonable juror" would still find Hyman guilty beyond a reasonable doubt of the charged crimes.

Accordingly, we conclude that Hyman has not made the actual innocence showing necessary to pass through the narrow gateway for

federal habeas review of his procedurally barred Sixth Amendment claim.[30]

## CONCLUSION

To summarize, we conclude:

1. There are no categorical limits on the types of evidence that can be offered to demonstrate actual innocence and, thus, the district court did not err in considering impeachment evidence.

---

[30] Because Hyman did not carry his gateway burden, the district court should not have decided—and we need not review—his barred Sixth Amendment claim. We, nevertheless, note that the merits of that claim are not apparent.

*First*, it is not clearly established by Supreme Court precedent that a fee dispute between a defense attorney and a potential witness gives rise to an "actual conflict" of interest that allows a petitioner to claim ineffective assistance of counsel without showing prejudice. In *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980), the Court recognized multiple concurrent representations to give rise to an actual conflict, but in *Mickins v. Taylor*, 535 U.S. 162 (2002), it cautioned against an "expansive application" of *Sullivan* to such circumstances as when "representation of the defendant somehow implicates counsel's personal financial interests," *Mickins v. Taylor*, 535 U.S. at 174–75. In *Tueros v. Greiner*, 343 F.3d 587 (2d Cir. 2003), this court stated that "we must look to *Sullivan*, not . . . *Mickens*" for "'clearly established Federal law,'" *id.* at 593. Nevertheless, we have since expressly relied on *Mickens* in refusing to extend *Sullivan* to circumstances involving an attorney's ethical obligation to correct false testimony. *See Torres v. Donnelly*, 554 F.3d 322, 326 (2d Cir. 2009). Thus, no clearly established Supreme Court precedent establishes an actual conflict of interest here.

*Second*, even if the circumstances indicated such a conflict, Hyman would have to show that it "'adversely affected his lawyer's performance.'" *Strickland v. Washington*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. at 350). The state court found that Hyman failed to do so because the Hinkson and Sanders affidavits allowed only speculation as to why trial counsel had not called Hinkson. The conclusion cannot be deemed an unreasonable application of clearly established law because Hinkson's own photographs seem to refute, rather than support, his opinion that it was impossible to see the shootout from the third-floor hallway window of 1540 Hassock Street. In these circumstances, the decision to forego calling a particular witness is generally a matter of strategy falling within the wide range of reasonable professional assistance. *See Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005); *see also Bell v. Cone*, 535 U.S. 685, 701–02 (2002).

2. The district court did not clearly err in finding some of the new evidence Hyman offered to support his actual innocence claim credible.

3. Even deferring to that credibility finding, however, on *de novo* review, we conclude that Hyman has not made the compelling showing of actual innocence necessary for merits review of his procedurally barred Sixth Amendment claim.

   a. The credible new evidence showed only that a recanting trial witness did not view the shootout at issue in the charged crimes, not that Hyman did not or could not have committed those crimes as indicated by new evidence found compelling in *Schlup*, *House*, and *Rivas*.

   b. The totality of the evidence nevertheless showed:

      i. Hyman's admitted presence at the crime scene as the sole occupant of the dark green car that was the focus of the shootout,

      ii. Three eyewitnesses, viewing the shootout from difference vantage points, each saw gunshots fired from the direction of that car,

      iii. Ballistic evidence strongly corroborates that gunshots were fired from, not only at, Hyman's car, and

      iv. No evidence (except for Hyman's own self-serving account) supports his ambush claim.

57

On this record, we cannot conclude that, upon learning of the recanted trial identification by a witness who had not seen the shootout, it is more likely than not that no reasonable juror would find Hyman guilty beyond a reasonable doubt.

Accordingly, the judgment of the district court is **REVERSED** and the petition for a writ of habeas corpus is **DISMISSED**.

DENNIS JACOBS, *Circuit Judge*, concurring:

I subscribe to the meticulous opinion of the Court.

The issue of actual innocence is an uncomfortably close question here. Since, in my view, Hyman's underlying claim of ineffective assistance of counsel fails, Hyman's inability to establish the gateway claim of actual innocence does not alter the result. Still, it bears notice that actual innocence is a hurdle raised high by precedents, presumptions, standards of review, and strict deference to state court rulings that (in my view) command deference without necessarily earning assent.

The new evidence propounded by Hyman amputates chunks of the prosecution case presented at trial. Hyman was certainly present; but Ellis, apparently the only witness who testified about seeing seen Hyman at the scene, credibly recanted her testimony that she saw him fire a gun; moreover, she testified that she was threatened with a gun to inculpate Hyman. And although the district court was skeptical of Ellis's account of the gunman, the thrust of her testimony is supported by other evidence adduced by Hyman: Benitez's testimony that Ellis and Ellis's boyfriend asked Benitez to lie about what she saw the night of the shooting. These recantations raise nagging doubts when considered with the disturbing fact that the gun supposedly used by Hyman just before he fled the

scene by car was found in the spare-wheel well of the locked trunk of someone else's car parked at the scene.

As the Court's opinion makes plain, Hyman's actual innocence claim is "credible." Op. at 41. However, the limits on our review compel the conclusion that the evidence is insufficiently "compelling" to clear the gateway finding of actual innocence. We are forced to this conclusion because, as the Supreme Court has instructed, it is not enough to show that the prosecution's case is lacking: a petitioner must set forth evidence of "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). This standard defeats Hyman's claim. But it is worth mentioning that, if Hyman were on trial today and the prosecution's case were critically impaired as it now is, Hyman would not have to establish his own innocence.

We are required to give deference and to observe these strong limitations on our own power. But we are not required to do so without disquiet. I have a strong doubt that the victim was killed by a bullet fired by Hyman from a gun that unaccountably turned up hidden in a place inaccessible to him. I concede that that doubt is not enough.

*    *    *

I commend this case to the attention of the Governor, who alone has power to grant relief if relief is justified.  See, e.g., Fox v. Johnson, 832 F.3d 978, 990 (9th Cir. 2016) (Hurwitz, J., concurring).  In making that determination, the Governor's inquiry would be greatly advanced by the detailed account of facts in the opinion of the Court.